IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**INDIGO MARKETPLACE, LLC**                                                                        **PLAINTIFF**

v.                              Case No. 4:22-CV-00618-LPR

**FARMOP CAPITAL, LLC**                                                                            **DEFENDANT**


**FARMOP CAPITAL, LLC**                                                                     **COUNTER-CLAIMANT**

v.

**INDIGO MARKETPLACE, LLC**                                                               **COUNTER-DEFENDANT**

## ORDER

This is a case about the proceeds from the sale of soybeans. Plaintiff (and Counter-Defendant) Indigo Marketplace, LLC and Defendant (and Counter-Claimant) FarmOp Capital, LLC both claim that they are entitled to the proceeds derived from soybeans grown by non-party TBG Farms, LLC.[1] TBG Farms and its owners recently filed for bankruptcy, which prompted FarmOp to file in this Court a Notice of Voluntary Bankruptcy Petitions.[2] FarmOp's Notice alleges that this instant lawsuit is thus automatically stayed.[3] Pending before the Court is Indigo's Motion to Strike the Notice of Voluntary Bankruptcy of a Non-Party as Unrelated.[4] For the following reasons, the Court GRANTS Indigo's Motion.

---

[1] *See* Compl. (Doc. 1) ¶¶ 22–39; Answer & Countercl. (Doc. 4) ¶¶ 53–65.

[2] Doc. 29.

[3] *Id.* ¶ 5.

[4] Doc. 31.

## BACKGROUND[5]

This case involves three key players—a farm, a lender, and a middleman. TBG Farms is a farm in Texarkana, Texas, that is owned and operated by Timothy and Bonnie Garrett.[6] In December of 2020, TBG Farms and a lender called FarmOp entered into a Loan and Security Agreement, in which FarmOp agreed to loan $3,275,000 to TBG Farms.[7] In exchange for the money, TBG Farms agreed to pay interest and granted FarmOp a "continuing security interest in" TBG Farms's crops, the "proceeds" from its crops, and other property then belonging to TBG Farms.[8] In other words, if TBG Farms defaulted on the loan, FarmOp could recoup its losses by collecting TBG Farms's crops, proceeds of crop sales, and other property. At some point, FarmOp filed UCC Financing Statements in Arkansas and Texas to perfect its security interest.[9]

In January of 2021, TBG Farms entered into an agreement with Indigo (a middleman) to sell TBG Farms's crops.[10] Indigo is an "agricultural company that . . . operate[s] a web-based platform that enable[s] farmers to market their grain to a network of end-purchasers using Indigo as a first purchaser."[11] Essentially, Indigo purchases future batches of crops from TBG Farms,

---

[5] The background facts are taken from the record as it stands at this point in the case. They should be taken as accurate for purposes of this Order only.

[6] *See* Ex. 1 (Notice of TBG Farms, LLC Bankr.) to Notice of Voluntary Bankr. Pets. (Doc. 29-1); Ex. 2 (Notice of the Garretts' Bankr.) to Notice of Voluntary Bankr. Pets. (Doc. 29-2); Ex. A (Bankr. Court Order) to Suggestion of Bankr. (Doc. 40) ¶ 3. Neither TBG Farms, LLC nor the Garretts are parties to this case.

[7] Ex. 3 (Forbearance Agreement) to Answer & Countercl. (Doc. 4-3) at 1; Ex. 1 (Loan and Security Agreement) to Answer & Countercl. (Doc. 4-1); *see* Compl. (Doc. 1) ¶ 17; Answer & Countercl. (Doc. 4) ¶ 53.

[8] Ex. 1 (Loan and Security Agreement) to Answer & Countercl. (Doc. 4-1) at 1, 3, 22; *see* Compl. (Doc. 1) ¶ 17; Answer & Countercl. (Doc. 4) ¶ 53. The Loan and Security Agreement explicitly adopts the Uniform Commercial Code of the State of Minnesota's definition of "proceeds." Ex. 1 (Loan and Security Agreement) to Answer & Countercl. (Doc. 4-1) at 1, 22. Thus, for purposes of the Loan and Security Agreement, "proceeds" are "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral . . . ." Minn. Stat. § 336.9-102(a)(64)(A) (2013).

[9] *See* Ex. 2 (FarmOp UCC Statements) to Answer & Countercl. (Doc. 4-2).

[10] Compl. (Doc. 1) ¶ 7; *see* Ex. 1 (Marketplace Seller Agreement) to Compl. (Doc. 1) at 10–11.

[11] Compl. (Doc. 1) ¶ 6.

lists the future batches of crops on Indigo's online marketplace, and sells the future batches of crops to end-users. This arrangement is governed by a Marketplace Seller Agreement.[12] The Marketplace Seller Agreement includes Indigo's right to "set off" any debt owed to it by TBG Farms. Specifically, the Agreement states:

> This Agreement is subject to Indigo's right to set-off any debts, claims or obligations from [TBG Farms]. To the extent [TBG Farms] ha[s] any obligation due and owing to Indigo, including any amounts owed for the financing of equipment and/or seed cost, then Indigo may, at its option, deduct any such outstanding amounts from any payment to [TBG Farms] for any transaction on the Indigo Marketplace.[13]

On January 11, 2021, pursuant to the Marketplace Seller Agreement, TBG Farms agreed to sell Indigo 450,000 bushels of corn for $4.405 per bushel.[14] But then TBG Farms failed to plant any corn. As a result, "TBG Farms cancelled the Corn Sale Confirmation and agreed to be assessed costs and losses due to th[e] cancellation . . . ."[15] These costs and losses included Indigo's liability to end users with whom it had entered into agreements based on TBG Farms's contractual promise of corn.[16] Over four months later, on May 20, 2021, TBG Farms agreed to sell Indigo 150,000 bushels of soybeans for $13.73 per bushel.[17] That sale did not go as planned, either. TBG Farms delivered only 15,260.39 bushels of soybeans to Indigo—about 134,739 less bushels than promised.[18] Additionally, only 7,506.14 bushels of the 15,260.39 bushels of delivered soybeans

---

[12] Ex. 1 (Marketplace Seller Agreement) to Compl. (Doc. 1) at 10–14.

[13] *Id.* at 11. A setoff is "the subtraction or taking away of one demand from another opposite or cross demand, so as to extinguish the smaller demand and reduce the greater by the amount of the less; or, if the opposite demands are equal, to extinguish both." Thomas W. Waterman, *A Treatise on the Law of Set-Off, Recoupment, and Counter Claim* 1 (1869).

[14] Compl. (Doc. 1) ¶ 8; Ex. 2 (Corn Futures Lock Confirmation) to Compl. (Doc. 1) at 20–22.

[15] Compl. (Doc. 1) ¶ 9.

[16] *See id.* ¶¶ 14–15.

[17] *Id.* ¶ 12; Ex. 3 (Soybean Futures Lock Confirmation) to Compl. (Doc. 1) at 23–25.

[18] Compl. (Doc. 1) ¶ 13.

were actually grown by TBG Farms.[19]  The record does not indicate who grew the remaining 7,754.25 bushels of soybeans that TBG Farms delivered to Indigo.  The delivery of only about 10% of the promised soybeans caused costs and losses for Indigo.[20]

Nevertheless, Indigo worked with what it received.  Indigo passed on the 15,260.39 bushels of delivered soybeans to end-users.[21]  The sales of the 7,506.14 bushels of TBG Farms-grown soybeans resulted in $93,932.17 in proceeds.[22]  Indigo "retained" the $93,932.17 "in accordance with its setoff rights under the Indigo Marketplace Agreement" to set off the damages Indigo incurred from TBG Farms's various breaches.[23]  Additionally, on March 1, 2022, Indigo demanded $599,726.17 from TBG Farms for the remaining damages.[24]  TBG Farms did not pay Indigo, and Indigo "has since asserted its claims [for the $599,726.17] against TBG Farms in an arbitration proceeding with the National Grain & Feed Association."[25]  There is no indication that TBG Farms filed a counterclaim against Indigo in the arbitration or has otherwise asserted a legal claim against Indigo with respect to the $599,726.17 that Indigo says it is owed or the $93,932.17 that Indigo retained as a setoff.

Meanwhile, TBG Farms was apparently falling behind on its loan from FarmOp.[26]  In fact, TBG Farms and FarmOp had entered into a Forbearance Agreement on February 28, 2022, in which TBG Farms admitted it had "failed to timely make payments to [FarmOp]" and, as a result,

---

[19] *Id.*

[20] *See id.* ¶ 14.

[21] *Id.*

[22] *Id.*; see *supra* note 8 for the definition of "proceeds."

[23] Compl. (Doc. 1) ¶ 14; *see supra* notes 12–20 and accompanying text.

[24] Compl. (Doc. 1) ¶ 15.

[25] *Id.* ¶ 16.

[26] *See* Answer & Countercl. (Doc. 4) ¶¶ 54–56; *see also* Compl. (Doc. 1) ¶ 17.

was "in default of the" loan.[27]  The Forbearance Agreement also required that TBG Farms "[t]urn over to [FarmOp] all . . . 2021 crop proceeds constituting [FarmOp's] Collateral on or before March 15, 2022 . . . ."[28]  The "2021 crop proceeds" contemplated by the Forbearance Agreement presumably included (or were intended to include) the proceeds that Indigo kept from the soybeans sales.[29]

Indeed, on March 2, 2022, FarmOp demanded that Indigo turn those proceeds over to FarmOp.[30]  Indigo did not do so.  Instead, Indigo filed the instant lawsuit.  In its Complaint, Indigo seeks a declaratory judgment that it has a superior interest in the $93,932.17 of soybean proceeds because (1) FarmOp did not comply with the notice requirements of the Food Security Act, (2) Indigo's contractual set off rights are superior to FarmOp's security interest in the proceeds, or (3) Indigo was a good-faith purchaser of the soybeans, and FarmOp obtained its security interest in the proceeds through inequitable conduct.[31]  FarmOp filed an Answer, denying that Indigo is entitled to the proceeds.[32]  FarmOp also filed a Counterclaim for (1) conversion, (2) a declaratory judgment that it is entitled to the proceeds, and (3) a constructive trust to hold the proceeds for the benefit of FarmOp.[33]  Indigo responded with an Answer to the Counterclaim, asserting that FarmOp is not entitled to the relief it seeks.[34]

The case then proceeded to the discovery phase.[35]  But during discovery, on February 14,

---

[27] Ex. 3 (Forbearance Agreement) to Answer & Countercl. (Doc. 4-3) at 1.

[28] *Id.* at 2.

[29] *See supra* notes 17–23 and accompanying text.

[30] Compl. (Doc. 1) ¶ 17; Answer & Countercl. (Doc. 4) ¶ 58.

[31] Compl. (Doc. 1) ¶¶ 22–39.

[32] Answer & Countercl. (Doc. 4) ¶ 40.

[33] *Id.* ¶¶ 50–74.

[34] Answer to Countercl. (Doc. 9).

[35] Fairly early in the discovery period, FarmOp filed a Motion for Partial Summary Judgment.  (Doc. 10).  Indigo opposed FarmOp's Motion and filed a Rule 56(d) Motion, arguing that FarmOp's Motion was "premature."  Rule

2023, FarmOp filed a Notice to alert the Court and Indigo that TBG Farms and the Garretts had filed for bankruptcy.[36] In the Notice, FarmOp asks the Court to "enter appropriate orders to reflect the automatic stay resulting from" TBG Farms's and the Garretts' bankruptcies.[37] Indigo responded with a Motion to Strike, asking the Court to "strike the Notice of Bankruptcy, and permit the instant action to proceed."[38] FarmOp has not responded to Indigo's Motion to Strike, and the time to do so has long since expired.[39]

Non-party TBG Farms and its owners (the Garretts) have, at the direction of the Bankruptcy Court, filed a Suggestion of Bankruptcy.[40] TBG Farms and the Garretts assert that "the outcome of this lawsuit will affect the amount of the claim[s]" Indigo and FarmOp have "in the pending bankruptcy case . . . ."[41] That pending bankruptcy case is a consolidation of the TBG Farms bankruptcy matter and the Garretts' bankruptcy matter.[42]

---

56(d) Mot. (Doc. 17); Br. in Opp'n to Mot. for Summ. J. (Doc. 21). The Court agreed that FarmOp's summary-judgment Motion was premature and deferred consideration of it until the close of discovery. Order (Doc. 28).

[36] Notice of Voluntary Bankr. Pets. (Doc. 29).

[37] *Id.* ¶ 6.

[38] Mot. to Strike (Doc. 31) at 1.

[39] Shortly after Indigo filed its Motion to Strike, FarmOp asked for an extension of time to respond to Indigo's Motion. Unopposed Mot. for Extension of Time (Doc. 34). Additionally, FarmOp's counsel moved to withdraw. Mot. to Withdraw (Doc. 33). The Court granted in part the time motion and extended the deadline to respond to Indigo's Motion to Strike to April 13, 2023. Order (Doc. 35). This was a 30-day extension. The Court also granted in part FarmOp's counsel's Motion to Withdraw; the Court made clear that "[w]hether or not FarmOp retains new counsel, this case will proceed—subject to the extension of time . . . ." Order (Doc. 36). That is, FarmOp needed to get new counsel quickly and would not be able to delay things further simply by not retaining counsel.

[40] Suggestion of Bankr. (Doc. 40) ¶ 7; Ex. A (Bankruptcy Cash Collateral Order) to Suggestion of Bankr. (Doc. 40) at 4, 11.

[41] Suggestion of Bankr. (Doc. 40) ¶ 6.

[42] *See* Debtor's Mot. for Joint Administration (Doc. 11) at 2, *In re TBG Farms, LLC*, Case No. 23-50020 (Bankr. E.D. Tex.) ("The Debtor submits that granting its Motion [f]or Joint Administration of its case with that of Timothy James Garrett, and wife, Bonnie Darlene Garrett (Case No. 23-50021-BTR-12), for joint administration would be more convenient for all parties in interest and creditors of both estates." (emphasis omitted)); Order Granting Mot. for Joint Administration (Doc. 40), *In re TBG Farms, LLC*, Case No. 23-50020 (Bankr. E.D. Tex.) (consolidating TBG Farms's bankruptcy matter and the Garretts' bankruptcy matter).

## DISCUSSION

The resolution of Indigo's Motion to Strike boils down to whether TBG Farms's and the Garretts' bankruptcies put this case on hold. The Court concludes that the bankruptcies do not stay the instant action.[43] This result is dictated by the statutory text of the Bankruptcy Code and consistent with the purpose of the automatic stay as understood through that text.

"The Bankruptcy Code's overall objective is to offer a 'fresh start' to insolvent debtors."[44] A business that files for bankruptcy will usually go through reorganization, which "permit[s] debts, both secured and unsecured . . . , as well as equity interests, to be restructured."[45] The "fundamental purpose of reorganization is to prevent [the] debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."[46] "By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners."[47] There are two tools that are vital to a successful reorganization—the bankruptcy estate and the automatic stay.

The bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case."[48] The estate is automatically created when the bankruptcy petition is filed.[49] The bankruptcy estate is managed by a trustee, whose duty is "to

---

[43] Although the Court concludes that the instant lawsuit is not stayed by reason of TBG Farms's and the Garretts' bankruptcies, this Order should not be read as opining on the impact of the automatic stay on Indigo's arbitration proceeding against TBG Farms with the National Grain & Feed Association, to the extent that proceeding is still live. *See* Compl. (Doc. 1) ¶ 16.

[44] *Willison v. Race*, 192 B.R. 949, 953 (W.D. Mo. 1995) (citation omitted).

[45] 1 Collier on Bankruptcy ¶ 1.01.

[46] *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984).

[47] *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983).

[48] 11 U.S.C. § 541(a)(1); *see, e.g.*, *Longaker v. Bos. Sci. Corp.*, 715 F.3d 658, 661 (8th Cir. 2013).

[49] *United States v. Mitchell*, 476 F.3d 539, 544 (8th Cir. 2007) ("The filing of a bankruptcy petition creates a new legal entity: the bankruptcy estate." (citing 11 U.S.C. § 541(a)(1))).

'collect and reduce to money the property of the estate for which such trustee serves.'"[50] To put it simply, the trustee pulls as much property as legally allowed into the estate so that such property can be liquidated, and the monies be distributed to creditors according to the reorganization plan.[51] For the duration of the bankruptcy case, creditors and others are prevented from making claims for the property of the estate or against the debtor (except within the confines of the bankruptcy case, of course) through the application of an automatic stay.

In its sphere of application, the automatic stay "is triggered upon the filing of a bankruptcy petition regardless of whether the other parties to the stayed proceeding are aware that a petition has been filed."[52] "The purpose of the automatic stay is to give the debtor a breathing spell from his creditors in which he may attempt a repayment or reorganization plan. . . . The automatic stay also protects creditors by averting a scramble for the debtor's assets and promoting instead an orderly liquidation procedure under which all creditors are treated equally."[53] 11 U.S.C. § 362(a) enumerates what actions are subject to the automatic stay.

FarmOp points to subsections 362(a)(3)–(5) and (7) as applicable to this case.[54] Those subsections provide that the bankruptcy stay prohibits:

> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> (4) any act to create, perfect, or enforce any lien against property of the estate;
>
> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title; [and]

---

[50] *In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1001 (8th Cir. 2007) (quoting 11 U.S.C. § 704(1)).

[51] *See generally* David G. Epstein & Steve H. Nickles, *Principles of Bankruptcy Law* 24–25 (2007).

[52] *In re Vierkant*, 240 B.R. 317, 320 (B.A.P. 8th Cir. 1999) (citation omitted).

[53] *In re Eugene L. Pieper, P.C.*, 202 B.R. 294, 297 (Bankr. D. Neb. 1996) (omission in original) (quoting *Farley v. Henson*, 2 F.3d 273, 274 (8th Cir. 1993)).

[54] Notice of Voluntary Bankr. Pets. (Doc. 29) ¶ 4.

8

> . . .
>
> (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor . . . .[55]

According to FarmOp, the instant case "is an action to obtain possession of [TBG Farms's] property, to enforce lien rights as to [TBG Farms's] property, and to setoff debts Indigo owes to TBG Farms, LLC against Indigo's asserted claims against TBG Farms, LLC."[56] Thus, FarmOp argues, the instant case is stayed by the bankruptcy petition.[57]

The subsections of the automatic stay that FarmOp cites are not applicable to the instant case. The Court will discuss each subsection in turn to explain why. First, subsections (3) and (4). Recall that those subsections prohibit various acts to enforce rights against "property of the estate."[58] And, in this case, Indigo and FarmOp are both claiming rights to the proceeds from soybeans sold to Indigo.[59] Therefore, subsections (3) and (4) only apply to this case if the soybean proceeds are property of the TBG Farms bankruptcy estate. They are not.[60]

There is no suggestion in the record that TBG Farms or the Garretts had any "legal or equitable interest[]" in the soybean proceeds "as of the commencement of the [bankruptcy] case."[61] FarmOp has not explained why it believes that TBG Farms or the Garretts had any such interest at

---

[55] 11 U.S.C. § 362(a)(3)–(5), (7).

[56] Notice of Voluntary Bankr. Pets. (Doc. 29) ¶ 5.

[57] *Id.*

[58] 11 U.S.C. § 362(a)(3)–(4); *see supra* note 55 and accompanying text.

[59] *See supra* pp. 3–5.

[60] It is true that subsection (3) also speaks of "property from the estate." 11 U.S.C. § 362(a)(3). The word "from" in that portion of subsection (3) does not change the analysis. In this context, "[p]roperty from the estate is property over which the estate has control or possession." *Avco Corp. v. Precision Airmotive LLC*, No. 4:12-CV-01313, 2013 WL 12112579, at *6 (M.D. Pa. Sept. 19, 2013); *In re St. Clair & Karen M. St. Clair*, 251 B.R. 660, 666–67 (D.N.J. 2000); *In re Kennedy*, 39 B.R. 995, 996 (C.D. Cal. 1984); *In re Quick Catering Co.*, 10 B.R. 250, 251 (Bankr. D. Nev. 2006). There is no indication that the bankruptcy estate has control or possession over the soybean proceeds at issue in this case.

[61] 11 U.S.C. § 541(a)(1).

the time they filed their bankruptcy petitions. Indeed, in the bankruptcy petitions, TBG Farms and the Garretts indicate that they have no such claims.[62] Further, the bankruptcy trustee who is overseeing the bankruptcy estate has not asserted an interest in the proceeds. And, if the estate did have a legal or equitable interest in the proceeds, the trustee has a duty to assert that interest.[63] The trustee has not done so, despite having notice that the 2021 crop proceeds are the subject of the instant lawsuit.[64] In short, there is no reason to think that TBG Farms or the Garretts had a legal or equitable interest in the proceeds at the time they filed their bankruptcy petitions. These petitions were filed on February 13, 2023, months if not a year after Indigo withheld the $93,932.17 in soybean proceeds as a setoff.[65] The proceeds are not property of the bankruptcy estate and subsections (3) and (4) do not apply.

Subsection (5) is inapplicable to the instant case for similar reasons. That subsection prohibits "any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title . . . ."[66] By its terms, subsection (5) concerns "property of the debtor," not "property of the estate."[67]

---

[62] *See* Summary of Assets and Liabilities for Non-Individuals (Doc. 25) at 5, *In re TBG Farms, LLC*, Case No. 23-50020 (Bankr. E.D. Tex.) (disclosing none when required to disclose "[c]auses of action against third parties (whether or not a lawsuit has been filed)" and "[o]ther contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims"); *see also* Schedule A/B: Property (Doc. 59) at 7, *In re TBG Farms, LLC*, Case No. 23-50020 (Bankr. E.D. Tex.) (same).

[63] *See supra* notes 49–50 and accompanying text.

[64] *See* Agreed Order (Doc. 53) at 3–4, 11, *In re TBG Farms, LLC*, Case No. 23-50020 (Bankr. E.D. Tex.) (Bankruptcy Court Order briefly discussing the instant lawsuit).

[65] *See* Voluntary Pet. for Non-Individuals Filing for Bankr. (Doc. 1), *In re TBG Farms, LLC*, Case No. 23-50020 (Bankr. E.D. Tex.); Voluntary Pet. for Individuals Filing for Bankr. (Doc. 1), *In re Timothy and Bonnie Garrett*, Case No. 23-50021 (Bankr. E.D. Tex.).

[66] 11 U.S.C. § 362(a)(5).

[67] *Id.*; *see In re Taylor*, No. 07-31055, 2007 WL 1234932, at *5 (Bankr. E.D. Va. April 26, 2007) ("Congress clearly understood the difference between property of the debtor and property of the estate. Those respective terms are employed repeatedly throughout § 362. . . . 'Where Congress includes particular language in one section of a statute but omits it in another, . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993))).

Property of the debtor during a bankruptcy includes things such as exempt property (e.g., a personal residence) and other property that does not become part of the bankruptcy estate.[68] The debtor (here, TBG Farms and the Garretts), however, must have a legal (or equitable) interest in the property for it to be "property of the debtor." As discussed above, TBG Farms and the Garretts have no known interest in the soybean proceeds.[69] Therefore, the instant lawsuit cannot be an action to "create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the" bankruptcy case because the subject of the instant lawsuit (i.e., the soybean proceeds) is not property of the debtor in the first place.[70]

Finally, subsection (7) does not stay the instant lawsuit as FarmOp contends. Recall that subsection (7) prohibits the "setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor . . . ."[71] Although it is true that Indigo exercised a right to setoff, it did so before the commencement of the bankruptcy case and thus before the imposition of the automatic stay.[72] The plain language of subsection (7) only applies to post-petition setoff attempts, not setoffs that occurred nearly a year

---

[68] 3 Collier on Bankruptcy ¶ 362.03 ("[Property of the debtor] includes property acquired by an individual debtor after the date of the filing of the petition, exempt property, abandoned property, and property that does not become a part of the estate such as the debtor's beneficial interest in a spendthrift trust."); *see Nessan v. Lovald*, 494 F. App'x 691, 693 (8th Cir. 2012) (per curiam) ("The Code, however, allows the debtor to prevent the distribution of certain property by claiming it as exempt. Exempt property is excluded from property of the estate available to satisfy debts." (quotation marks and citations omitted)); *see generally In re Sholdan*, 217 F.3d 1006, 1008 (8th Cir. 2000) ("Sholdan liquidated almost all of his non-exempt property consisting of bank accounts, certificates of deposit and a mortgage against his former farmstead, and converted it into exempt property in the form of a house . . . ."); *Nielsen v. Dickerson*, No. 98-C-5909, 1999 WL 350649, at *5 (N.D. Ill. May 20, 1999) ("Section 522 permits a debtor to identify exempt personal property that remains outside the scope of the bankruptcy estate and remains the 'property' of the debtor.").

[69] *See supra* notes 61–62 and accompanying text.

[70] 11 U.S.C. § 362(a)(5).

[71] *Id.* § 362(a)(7).

[72] Indigo exercised its contractual setoff rights sometime between November of 2021 and February of 2022. *See* Br. in Supp. of Mot. to Strike (Doc. 32) ¶¶ 6–7; *see also* Compl. (Doc. 1) ¶¶ 14–15. The bankruptcy petitions were filed about a year later, in February of 2023. Notice of Voluntary Bankr. Pets. (Doc. 29) ¶¶ 2–3.

11

prior to the bankruptcy petition being filed.[73]  Therefore, subsection (7) does not apply here.[74]

In addition to the statutory text, there is another reason the automatic stay is not applicable to the instant case: TBG Farms is not a defendant in our case and TBG Farms has not asserted any claim of ownership with respect to the $93,932.17 that Indigo retained as a setoff.  "As a general proposition, th[e] automatic stay provision of the Bankruptcy Code applies only to bar actions against the debtor . . . ."[75]  The parties to this action are Indigo and FarmOp, neither of which are debtors in the relevant bankruptcies.  The debtors—TBG Farms and the Garretts—are not parties to this action.  The Court knows of no binding authority that extends the application of the automatic stay to an action that is (1) against a non-debtor, and (2) regarding non-bankruptcy-estate property.  FarmOp has not pointed to any such cases.

Consider, for example, *Croyden Associates v. Alleco, Inc.*[76]  In *Croyden*, Alleco had issued a large sum of debentures to the public.[77]  After Alleco issued the debentures, Service America

---

[73] *See* 11 U.S.C. § 362(a)(7); *In re Taalib-Din*, No. 16-CV-11794, 2017 WL 3447903, at *3 (E.D. Mich. June 2, 2017) ("[11 U.S.C.] § 362(a)(7) deals with the right to setoff during the automatic stay . . . ."); *P.R. Elec. Power Auth. v. Maxon Eng'g Servs., Inc.*, No. 06-1538, 2007 WL 9770106, at *2 (D.P.R. Oct. 3, 2007) ("Section 362(a)(7) prevents creditors from exercising their setoff rights after a debtor has filed for bankruptcy."); *Bridgeport Co. v. U.S. Postal Serv.*, 39 B.R. 118, 128 (Bankr. E.D. Ark. 1984) ("By inference, a clear implication exists that a creditor can utilize its set off remedy prior to bankruptcy without approval of a court.").

[74] In addition to its arguments that the automatic stay is not applicable to the instant case, Indigo points out that "the Bankruptcy Code preserves the right of setoff prior to the commencement of a bankruptcy case . . . ."  Br. in Supp. of Mot. to Strike (Doc. 32) ¶ 31.  Indigo is correct that 11 U.S.C. § 553(a) "recognizes and preserves rights to setoff where four conditions exist," but § 553(a) is not immediately applicable to the instant case. 5 Collier on Bankruptcy ¶ 553.01.  That is because § 553(a) only preserves a creditor's pre-petition setoff rights during the bankruptcy and allows that creditor to petition the bankruptcy court for relief from the automatic stay to exercise its setoff rights.  *See* 5 Collier on Bankruptcy ¶ 553.06; *see also In re Ogle*, No. 10-50113, 2011 WL 666359, at *5 (Bankr. D.S.D. Feb. 14, 2011) ("Cause for relief from the stay to exercise a setoff exists once a creditor establishes the four elements for a setoff . . . ."); *see generally In re Nelson*, 6 B.R. 248, 250 (Bankr. D. Kan. 1980) ("Absent court-granted relief from the automatic stay [creditor's] setoff against [debtor's] deposited funds was *an act* to collect [creditor's] prepetition claim in violation of the § 362(a)(6) injunction." (emphasis in original)).  Here, however, Indigo exercised its setoff rights a year before the bankruptcy petitions were filed.  So, Indigo does not need to rely on § 553(a) to preserve during the bankruptcy a right that it exercised well before the commencement of the bankruptcy.

[75] *C.H. Robinson Co. v. Paris & Sons, Inc.*, 180 F. Supp. 2d 1002, 1009–10 (N.D. Iowa 2001) (collecting authorities).

[76] 969 F.2d 675 (8th Cir. 1992).

[77] *Id.* at 676.  A "debenture" is a "debt secured only by the debtor's earning power, not by a lien on any specific asset."  *Debenture*, *Black's Law Dictionary* (11th ed. 2019).

"assume[d] Alleco's obligations under the debentures."[78] Worried that Service America's assumption of the obligations put their investment at risk, several of the debenture holders "filed a [class action] complaint . . . against Alleco and Service America, seeking the payment of principal and interest on the debentures as well as a declaration of the class's rights regarding the acceleration and payment of the debentures."[79] After the court granted class certification, the parties reached a settlement.[80] The district court approved the class settlement over the objections of one class member, the Weinberg Foundation.[81]

The Weinberg Foundation appealed the approval of the settlement.[82] While the appeal was pending, Alleco filed for bankruptcy.[83] The Eighth Circuit stayed the appeal, pursuant to 11 U.S.C. § 362(a)(1), as it related to Alleco.[84] It then considered whether the stay also applied to the appeal as it related to Service America. The Eighth Circuit held that it did not. Specifically, the Eighth Circuit stated that "the stay required by [11 U.S.C. §] 362 . . . is not available to nonbankrupt codefendants, even if they are in a similar legal or factual nexus with the debtor."[85] The Eighth Circuit and other courts within the Eighth Circuit have since re-affirmed this rule.[86] Of course, our case is even a step removed from this because in our case the bankrupt persons and entity are

---

[78] *Croyden Assocs.*, 969 F.2d at 676.

[79] *Id.*

[80] *Id.* at 677.

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.* (internal quotation marks and citation omitted).

[86] *See, e.g.*, *Sav-A-Trip, Inc. v. Belfort*, 164 F.3d 1137, 1139 (8th Cir. 1999) ("[T]he bankruptcy automatic stay enjoyed by defendants Stratton Oakmont and Bloom does not properly extend to [nonbankrupt] appellants. Extension of an automatic stay to a debtor's co-defendants is only proper in unusual circumstances."); *In re Eugene L. Pieper, P.C.*, 202 B.R. at 298 ("The Eighth Circuit Court of Appeals also follows the principle that a co-defendant is not entitled to the protection of the automatic stay after another defendant files a petition for bankruptcy.").

13

not parties at all.

It is true that "the Eighth Circuit Court of Appeals has recognized that, under 'unusual circumstances,' the automatic stay provision can embrace claims against non-bankrupt codefendants."[87] The unusual-circumstances exception stems from a Fourth Circuit case, *A.H. Robins Company v. Piccinin*.[88] That case arose out of more than 5,000 products liability lawsuits filed against A.H. Robins Co. for damages allegedly caused by its Dalkon Shield intrauterine device.[89] More than half of the 5,000 cases named A.H. Robins Co. as the sole defendant, while the others named A.H. Robins Co. and one or more co-defendants.[90] In 1985, the cost of the Dalkon Shield litigation caused A.H. Robins Co. to file for bankruptcy.[91] Upon the bankruptcy filing, the lawsuits against A.H. Robins Co. were automatically stayed.[92] Disagreement resulted, however, over whether the bankruptcy stayed the actions against the solvent co-defendant(s).[93]

The Fourth Circuit ultimately decided that the actions against the solvent co-defendant(s) were stayed by the bankruptcy.[94] In explaining its decision, the Fourth Circuit stated that the unusual circumstances arise "when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against

---

[87] *C.H. Robinson Co.*, 180 F. Supp. 2d at 1010; *Sav-A-Trip, Inc.*, 164 F.3d at 1139 ("Extension of an automatic stay to a debtor's co-defendants is only proper in unusual circumstances.").

[88] 788 F.2d 994 (4th Cir. 1986); *Croyden Assocs.*, 969 F.2d at 677 ("The only exception to this rule that any of the circuits recognize seems to relate only to nonbankrupt codefendants in unusual circumstances." (citing *A.H. Robins Co.*, 788 F.2d at 999) (internal quotation marks omitted)); *see Stephen Inv. Secs., Inc. v. SEC*, 27 F.3d 339, 342 n.5 (8th Cir. 1994) ("Some courts have acknowledged that under limited circumstances where an identity of interest exists between a debtor and a third party non-debtor, a bankruptcy court's automatic stay might also apply to property of the third party non-debtor." (citing *A.H. Robbins Co.*, 788 F.2d at 999)).

[89] *A.H. Robins Co.*, 788 F.2d at 996.

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.* at 1016.

the third-party defendant will in effect be a judgment or finding against the debtor."[95] Such was the case for the *A.H. Robins Co.* co-defendants, who were "entitled to indemnification by [A.H. Robins Co.] under the corporate by-laws and the statutes of Virginia, . . . and were, in addition, additional insureds under the debtor's insurance policy."[96] The Fourth Circuit helpfully explained that "[i]t seem[ed] incontestable that, if the suits [were] permitted to continue and discovery allowed, any effort at reorganization of the debtor [would have been] frustrated, if not permanently thwarted."[97]

The unusual-circumstances exception does not apply to the instant case. First, unlike in *A.H. Robins Co.* and the Eighth Circuit cases that endorse its exception, the bankrupt person or entity is not a party in this case.[98] So there is no bankrupt co-defendant. Second, there is no evidence that FarmOp's interests "are so intimately intertwined with those of the debtor[s] [TBG Farms and the Garretts] that the latter may be said to be the real part[ies] in interest . . . ."[99] Further, there is no evidence that a judgment for Indigo (or FarmOp) in the instant case would give rise to a cause of action for indemnity against TBG Farms or the Garretts. And there is definitely no evidence that a judgment for Indigo (or FarmOp) in the instant case would impose any new liability on TBG Farms or the Garretts. In fact, beyond the creditor-debtor relationship, there is no evidence at all of an "identity of interest" between TBG Farms, the Garretts, and FarmOp.[100] And FarmOp has not argued that any such special relationship exists.

While the Court could stop here, it is worth noting that the purposes of the automatic stay

---

[95] *Id.* at 999.

[96] *Id.* at 1007.

[97] *Id.* at 1008.

[98] *Id.* at 996; *Sav-A-Trip, Inc.*, 164 F.3d at 1139; *Croyden Assocs.*, 969 F.2d at 677.

[99] *A.H. Robins Co.*, 788 F.2d at 1001.

[100] *Stephen Inv. Secs.*, 27 F.3d at 342 n.5.

do not support its application to the instant case. As noted above, the purposes of the automatic stay are to allow the debtor time to reorganize and to prevent creditors from scrambling for the debtor's assets.[101] These purposes make sense considering the primary goal of the bankruptcy process—an orderly and streamlined process of reorganizing a debtor's obligations to its creditors. Allowing the instant case to proceed will not interfere with those purposes.

As to the first purpose of the stay (allowing the debtor time and space to reorganize), this case does not involve a claim against the debtors or for property of the bankruptcy estate.[102] Thus, the resolution of this action will not interfere with the reorganization of TBG Farms's and the Garretts' relationship to their creditors.[103] Nor does the instant case involve two creditors scrambling for TBG Farms's or the Garretts' assets. As previously discussed, neither TBG Farms, nor the Garretts, nor the bankruptcy estate appear to have a legal interest in the soybean proceeds.[104] There is no suggestion that Indigo's setoff of the soybean proceeds was legally invalid with regard to TBG Farms and the Garretts. In other words, the proceeds were never—and are not—assets belonging to the debtors or the bankruptcy estate. As far as the record at this stage of the litigation indicates, when the soybeans were sold to end-users, the proceeds immediately became property of Indigo (or FarmOp). Simply put, this lawsuit cannot be a fight over TBG Farms's or the Garretts' assets if the soybean proceeds were never TBG Farms's or the Garretts'

---

[101] *See supra* note 53 and accompanying text.

[102] *See supra* pp. 9–11.

[103] *Cf. In re S.I. Acquisition, Inc.*, 817 F.2d 1142, 1147 (5th Cir. 1987) ("We concluded that extending the automatic stay to nonbankrupt defendants, who were not related to or components of the debtors, did not advance the underlying purposes of the stay. . . . The other circuits that have interpreted the scope of a section 362(a)(1) stay agree that it is not available for the benefit of nonbankrupt codefendants because such an extension of the stay does not promote the underlying purposes of the automatic stay provision, i.e., debtor/creditor protection.").

[104] *See supra* pp. 9–11.

assets in the first place.[105]

## CONCLUSION

For the foregoing reasons, the Court GRANTS Indigo's Motion to Strike the Notice of Voluntary Bankruptcy of a Non-Party as Unrelated.[106] There is a separate but important point that bears mentioning at this juncture: FarmOp is not currently represented by counsel in this lawsuit. Its lawyers filed a Motion to Withdraw on March 13, 2023.[107] The Court granted that Motion on March 15, 2023.[108] Since then, no one has entered an appearance on behalf of FarmOp. It thus appears that FarmOp is attempting to proceed *pro se*. But a corporation cannot proceed in federal court *pro se*.[109] Therefore, FarmOp must retain counsel to represent it in this lawsuit without further delay. Such counsel must enter an appearance in this case within thirty days of the date of this Order. If, after thirty days, an attorney has not entered an appearance on behalf of FarmOp, the Court will entertain a motion by Indigo for default judgment.[110]

---

[105] The conclusion that the bankruptcy stay does not apply to the instant case is not changed by TBG Farms's and the Garretts' statement that "the outcome of this lawsuit will affect the amount of [Indigo's and FarmOp's] claim[s] in the pending bankruptcy case . . . ." Suggestion of Bankr. (Doc. 40) ¶ 6. This statement appears to simply reflect the reality that whichever party is found to be entitled to the proceeds in the instant action might have that much less of a claim in the bankruptcy case and vice versa. What the statement does not do is indicate in any way that the proceeds are property of the bankruptcy estate, that TBG Farms or the Garretts have a claim to the proceeds, or that unusual circumstances exist that require extending the automatic stay to the instant action.

[106] Doc. 31.

[107] Mot. to Withdraw as Counsel for Def. FarmOp Capital, LLC (Doc. 33).

[108] Order (Doc. 36).

[109] *Carr Enters., Inc. v. United States*, 698 F.2d 952, 953 (8th Cir. 1983) (per curiam) ("It is settled law that a corporation may be represented only by licensed counsel."); *see also Strong Delivery Ministry Ass'n v. Bd. of Appeals of Cook Cnty.*, 543 F.2d 32, 33 (7th Cir. 1976) (per curiam) ("It is admitted that a corporation can only appear by attorney. . . . A corporation, it is true, can appear only by attorney, while a natural person may appear for himself." (omission in original) (quoting *Osborn v. Bank of the United States*, 22 U.S. 738, 829–30 (1824))).

[110] *See Solis v. Direct Workforce, Inc.*, Case No. 09-2161, 2010 WL 4569188, at *1 (W.D. Ark. Nov. 3, 2010) ("Default judgment is a mechanism by which the Court can proceed to conclusion in a case where the adversary process has been halted because of an essentially unresponsive party." (internal quotation marks and citation omitted)); *cf. H&R Block Enters. LLC v. Ascher*, Case No. 4:15-cv-00178, 2015 WL 5008996, at *2 (W.D. Mo. Aug. 20, 2015) ("[W]here a defendant has filed no response or taken any other action indicating an intent to respond, the defendant is considered a totally unresponsive party, and default judgment against the defendant is appropriate under Fed. R. Civ. P. 55(b)." (internal quotation marks and citation omitted)).

IT IS SO ORDERED this 26th day of May 2023.

                                                                _____
                                                                LEE P. RUDOFSKY
                                                                UNITED STATES DISTRICT JUDGE